# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 22-1429V

|  |  |
|---|---|
| DEANNA A. FINCH,<br><br>               Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>               Respondent. | Chief Special Master Corcoran<br><br>Filed: November 8, 2024 |

*Robert Deniger Cobb, Jr., Nahon, Saharovich & Trotz, Memphis, TN, for Petitioner.*

*Parisa Tabassian, U.S. Department of Justice, Washington, DC, for Respondent.*

### FINDINGS OF FACT AND CONCLUSIONS OF LAW DISMISSING TABLE CLAIM AND TRANSFER ORDER[1]

On October 3, 2022, Deanna A. Finch filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges (under the Vaccine Act Table) that she suffered from Guillain-Barré syndrome ("GBS") as a result of an influenza ("flu") vaccine she received on October 4, 2019. Pet. at 1-2. Petitioner alternatively alleges (as an off-Table claim) that her vaccination was the cause-in-fact of her GBS and ANCA-vasculitis, peripheral neuropathy, subacute sensory polyneuropathy, acute-chronic kidney disease, rheumatoid arthritis ("RA"), acute polyarthritis, microscopic polyarteritis nodosa, chronic pain syndrome, and osteoarthritis. *Id*.

---

[1] Because this unpublished Ruling contains a reasoned explanation for the action in this case, I am required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). **This means the Ruling will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

For the reasons discussed below, the Table version of Petitioner's claim is hereby **DISMISSED** – although a non-Table claim could still be tenable. To aid in the efficient resolution of this matter, transfer is thus appropriate.

## I.    Relevant Procedural History

As noted, the case was filed in the fall of 2022. ECF No. 1. Respondent's Rule 4(c) Report (filed on March 7, 2024,) sets forth his objection to the Table claim asserted herein. ECF No. 24. Respondent argues that the medical records support more likely alternative diagnoses to explain Petitioner's condition. *Id.* at 13. Specifically, while physicians initially suspected Petitioner suffered from GBS (or chronic inflammatory demyelinating polyneuropathy ("CIDP")), Petitioner's treaters eventually (after "ineffective IVIG treatment, laboratory studies, an EMG, a renal biopsy, and continuation of her symptoms,") diagnosed her with ANCA vasculitis and vasculitis neuropathy. *Id.* (citing Ex. 18 at 9-94; Ex. 22 at 34, 97-102; Ex. 24 at 98, 124-30, 196-97, 211-18, 223-24; Ex. 25 at 2-20; Ex. 26 at 22-27, 43-50, 93-96). Additionally, Respondent further notes Petitioner was diagnosed with a number of rheumatological conditions – but *no treater* attributed them to the subject vaccination. *Id.* at 13-14 (citing Ex. 18 at 9-94).

On July 30, 2024, Petitioner was ordered to show cause why her Table GBS claim should not be dismissed. ECF No. 26. I explained that the record as it stands contains several items of evidence supporting possible alternate "exclusionary" diagnoses for Petitioner's GBS – including vasculitis. *Id.* at 1. More so, I noted that Petitioner's reports of a one-day onset likewise do not support the Table's requirements for GBS and her Table claim would thus fail. *Id.* at 6-7. In reaction, Petitioner filed a status report stating that she wishes to proceed with a causation-in-fact claim and requesting to submit an expert report. ECF No. 27. Resolution of Petitioner's Table claim is now ripe for consideration.

## II.    Factual Background[3]

Petitioner received the subject flu vaccine on October 4, 2019. Ex. 2 at 1-2. Petitioner attests that "[t]he day after receiving the flu vaccine [on October 5, 2019], [she] became nauseated, began throwing up, felt achy, and had diarrhea." Ex. 16 ¶ 6. She also states that "[a]pproximately 3-4 days after receiving the flu vaccine [on October 7, 2019], [she] began to feel numbness, and tingling in [her] extremities and it became difficult to walk." *Id.* ¶ 7.

---

[3] A more complete recitation of the facts can be found in the Petition and Respondent's Rule 4(c) Report. Although I have reviewed all of the records filed to date, I have limited my discussion in this Ruling to the records most relevant to the resolution of Petitioner's Table claim, with a particular focus on diagnosis and the onset of Petitioner's alleged injury, where appropriate.

Three weeks later, on October 28, 2019, Petitioner presented to her primary care physician ("PCP") complaining of "diarrhea, vomiting, and achy joints X 2 weeks since having the flu shot." Ex. 4 at 1. She also noted swelling in "every" joint and lower extremities, specifically that it "feels like electricity is running through her body." *Id.* Petitioner presented via wheelchair because she was having trouble walking due to "all over weakness." *Id.* Petitioner was assessed with "generalized weakness and arthralgia[,]" plus a concern for GBS. *Id.* at 3. Petitioner was referred to the emergency room ("ER"). *Id.*

Petitioner then went to the ER complaining of "pain all over her body[,] mainly in the joints of the hands[,] in the legs and knees[,] and the back[; she] feels swelling in her fingers. And decreased energy." Ex. 5 at 4. Petitioner reported that "[t]his started 3 weeks ago [or around October 7, 2019,] and is still present." *Id.* A physical examination revealed mild swelling of the joints and bilateral hands. *Id.* at 5. Petitioner was assessed with acute polyarthritis "due to rheumatoid disease," as her rheumatoid factor was positive. *Id.* at 7. She was discharged. *Id.*

Over one month later, on December 3, 2019, Petitioner returned to the ER complaining of "paresthesias, to include weakness in the lower extremities . . . [and] feeling like her nerves are outside her legs with pain . . . some fingertip pain[,] as well as occasional spasms in her legs." Ex. 6 at 5. Her physical examination showed trace pedal edema and 4/5 strength in all extremities. *Id.* at 6. Petitioner was admitted. *Id.*

While admitted (on December 4, 2019), Petitioner underwent a neurology evaluation and reported that "shortly" after an early October vaccination, she "began to have paresthesias in her limbs and these seemed to reach a peak at least 4 weeks after their onset[.]" Ex. 6 at 7. A physical examination showed reduced motor strength, reduced vibratory sensation in the toes, ankles, and fingers, reduced temperature/pinprick sensation in the lower extremities and hands, and reduced reflexes. *Id.* at 7-9. The neurologist's impression was a "variation of [GBS], that is, a somewhat more subacute variety of inflammatory demyelinating polyneuropathy. Usually CIDP . . . is longer standing . . . and is associated with loss of reflexes. [GBS] was less consistently associated with loss of reflexes." *Id.* The neurologist ordered a lumbar puncture, IVIG, and gabapentin. *Id.* at 9-10. Petitioner also underwent bloodwork (showing a normal cerebrospinal fluid ("CSF") and white blood count) and an MRI of the L-spine (showing lateral disc protrusion at L5-SI on the left with nerve root impingement and mild chronic compression deformity of the L5 vertebral body). *See* Ex. 22 at 352, 371, 563, 569, 572.

After receiving five doses of IVIG and undergoing physical therapy ("PT"), Petitioner was discharged from the hospital on December 11, 2019. Ex. 6 at 2. Petitioner's attending physician noted that Petitioner had anemia and a vitamin D deficiency, but otherwise her "clinical course was uneventful." *Id.* at 3. Petitioner's discharge diagnosis

3

included "subacute GBS," acute hypokalemia and hyponatremia, dyspepsia, constipation, and anxiety. *Id.* Petitioner was instructed to continue outpatient PT and to take gabapentin and an opioid for pain. *Id.* at 2-3.

Two days after her hospital discharge, on December 13, 2019, Petitioner followed up with her PCP. Ex. 20 at 6. A physical examination was consistent with lower extremity weakness. *Id.* at 7. Petitioner's PCP assessed Petitioner with "[GBS] following vaccination," and Petitioner received a renewal of her gabapentin and opioid prescriptions. *Id.* at 8.

Petitioner returned to the ER on January 6, 2020, complaining of "worsening paresthesias as well as nausea and diarrhea x3 on the day of arrival." Ex. 8 at 2. She also reported "off and on paresthesias in her bilateral feet and ankle as well as the left wrist stating that her left hand was dead."[4] *Id.* Petitioner's admission diagnoses were listed as worsening paresthesia in the legs and left wrist, acute renal failure, neuropathy, possible UTI, and leukocytosis. *Id.* Petitioner was discharged on January 10, 2020, with a diagnosis of worsening paresthesias in both legs and her left wrist (that was stable). *Id.* Upon discharge, the ER physician noted that Petitioner's acute renal failure, nausea/vomiting/diarrhea, and neuropathy had improved or resolved, and a suspected UTI was "ruled out." *Id.*

During a PCP follow-up on January 20, 2020, Petitioner reported symptoms of fatigue and "feeling poorly," limb pain, limb swelling, muscle cramps, and weakness. Ex. 4 at 7. The PCP noted that Petitioner "has [GBS] from flu vaccine" and hypokalemia. *Id.* Petitioner received refills of her prescription medications and she was prescribed a muscle relaxer. *Id.*

On January 28, 2020, Petitioner returned to the ER reporting weakness, numbness, and difficulty breathing. Ex. 9 at 9-10. Petitioner underwent a neurology consultation upon admission. Ex. 24 at 124. The neurologist noted Petitioner's previous diagnosis of subacute GBS, despite a normal CSF and "treatment with IVIG . . . [after which Petitioner] never showed improvement and continued to have progressive symptoms." *Id.* at 125. Following a physical examination (revealing muscle wasting in the hands, weakness secondary to pain in the distal extremities, diffuse reflexes, paresthesias, but no loss of sensation in the distal extremities), the neurologist noted that "GBS does not progressively get worse and . . . [Petitioner's] protein . . . is in normal range which also is not consistent with [GBS]." Ex. 9 at 14. The neurologist opined that "this is likely CIDP" but also noted that "given [Petitioner's] elevated sedimentation rate, elevated

---

[4] The ER physician noted that he and nurses noticed Petitioner using her left hand when she was not being actively observed by the staff. Ex. 8 at 2.

[C-reactive protein ("CRP")] and acute renal failure would be a systemic vasculitis . . . this could lead to a vasculitic neuropathy or myopathy." Ex. 24 at 128. The neurologist documented the "differential for primary vasculitis with neuropathy" included polyarteritis nodosa, ANCA vasculitis, and secondary systemic vasculitidies (lupus, RA, Sjögren's syndrome). *Id.*

An EMG performed on January 29, 2020, was abnormal and showed a "severe, generalized, late subacute to early chronic, predominantly axonal peripheral neuropathy." Ex. 24 at 98, 214-16. The interpreting neurologist's impression "given [Petitioner's] clinical presentation with normal protein and lumbar puncture as well as progression past 8 weeks with kidney failure and elevated [erythrocyte sedimentation rate] and CRP, [was that] this seems to fit most consistently with a vasculitic neuropathy." *Id.* at 216. The neurologist maintained his previous assessment of systemic vasculitis and vasculitis neuropathy when he re-examined Petitioner on January 30, 2020. *See id.* at 211-14.

Also on January 29, 2020, Petitioner had a rheumatology consultation for "progressive weakness in the face of high inflammatory markers." Ex. 24 at 129. The rheumatologist noted that Petitioner was initially thought to have GBS "after flu vaccine" but she has continued to "deteriorate" despite treatment. *Id.* After reviewing Petitioner's lab results (showing significant anemia, elevated inflammatory markers, thrombocytosis, and a positive rheumatoid factor), the rheumatologist assessed Petitioner with vasculitic neuropathy, systemic vasculitis, inflammatory polyarthritis, and noted a possible autoimmune inflammatory process. *Id.* at 130.

While still hospitalized, on February 4, 2020, Petitioner underwent a renal biopsy – which was consistent with ANCA vasculitis (with 80% glomerulus with necrotizing crescentic lesions and 15% fibrosis). Ex. 24 at 196-97. Following a nephrology consultation later that day, the nephrologist assessed Petitioner with ANCA-positive vasculitis, vasculitis with neuropathy, and systemic vasculitis. *Id.* Petitioner was ordered to begin weekly Rituxan infusions and to continue her high-dose steroid. *Id.*

Following five days of IV and oral steroids and Rituxan infusions, Petitioner was discharged to home-health care on February 12, 2020, with diagnoses of ANCA vasculitis, vasculitic neuropathy, an acute kidney injury, leukocytosis, thrombocytosis, vitamin D deficiency, iron anemia, hypothyroidism, and hypertension Ex. 9 at 33. She was prescribed medications including prednisone, Lyrica, dapsone, tizanidine, and Rituxan infusions. *Id.* at 34. Petitioner began in-home healthcare on February 14, 2020, for the diagnoses of necrotizing vasculopathies, CIDP, and GBS. Ex. 23 at 43, 367.

On February 19, 2020, Petitioner had a rheumatology follow up for ongoing weakness and sensory neuropathy. Ex. 18 at 5. The rheumatologist's assessment was RA, microscopic polyarteritis nodosa, and polyneuropathy. *Id.* at 7. Petitioner's

rheumatologist maintained this assessment throughout Petitioner's treatment course (through October 2022), while adding Cushing's syndrome (due to ongoing steroid usage), Sjögren's syndrome, fibromyalgia, microscopic polyangiitis, and subacute sensory neuropathy to the list of diagnoses. *Id.* at 51, 65-69. Petitioner completed her four prescribed Rituxan infusions by March 2020. *Id.* at 9.

Petitioner had a nephrology appointment on April 8, 2020. Ex. 25 at 2. The nephrologist noted that Petitioner had "neuropathic pain as well as generalized weakness starting in the fall of last year after a flu shot and viral infection. She has been worked up for possible [GBS]." *Id.* The nephrologist assessed Petitioner, in part, with acute-on-chronic kidney disease (which was "subsiding") and P-ANCA vasculitis. *Id.* at 3. Petitioner received ongoing treatment for said injury throughout 2020 and 2021. *See,* e.g., Ex. 20 at 15-56; Ex. 25 at 2-20.

Petitioner visited a rheumatologist at the Mayo Clinic on June 7, 2021, reporting that "she had a flu shot and the following day started noticing issues with diarrhea nausea vomiting and feeling achy[,]" she then experienced weakness and pain. Ex. 26 at 93-94. The rheumatologist noted that it was thought Petitioner "could have [GBS] but apparently that was ruled out" when she did not respond to treatment. *Id.* at 94. A physical examination revealed osteoarthritic pain in her hands, diffuse myofascial tenderness on palpation, generalized weakness, pain in her shoulders, bilateral pitting edema of the legs, and normal/symmetric reflexes. *Id.* at 95. Petitioner was assessed with "vasculitis antineutrophil cytoplasmic antibody associated [ANCA vasculitis]," peripheral neuropathy, and chronic pain syndrome. *Id.* After a review of Petitioner's bloodwork, the rheumatologist opined that "the majority of [Petitioner's] symptoms are related to [her] significant polyneuropathy[.]" *Id.* at 96.

On July 23, 2021, Petitioner declined any additional vaccines "due to ANCA vasculitis reaction with [a f]lu shot." Ex. 19 at 26. Later that summer, on August 23, 2021, Petitioner underwent a peripheral nerve neurology consultation at the Mayo Clinic. Ex. 26 at 22. The neurologist's impression was "severe" axonal length-dependent polyneuropathy, suspected confluent vasculitic polyneuropathy, neuropathic pain, multifactorial imbalance, and an outside diagnosis of ANCA vasculitis that was improved with medications (such as Rituxan). *Id.* The physician also noted that Petitioner's physical examination was consistent with her prior EMG (showing moderate-severe axonal sensory predominant length-dependent polyneuropathy and vasculitis neuropathy). *Id.* at 23. The "final diagnosis" list included peripheral neuropathy and ANCA vasculitis. *Id.* at 27. A repeat EMG was considered consistent with peripheral neuropathy. *Id.* at 43-47. There are no records of any subsequent treatment pertinent to diagnosis or onset.

### III.    Applicable Legal Standards

Under Section 13(a)(1)(A) of the Act, a petitioner must demonstrate, by a preponderance of the evidence, that all requirements for a petition set forth in section 11(c)(1) have been satisfied. A petitioner may prevail on her claim if the vaccinee for whom she seeks compensation has "sustained, or endured the significant aggravation of any illness, disability, injury, or condition" set forth in the Vaccine Injury Table (the Table). Section 11(c)(1)(C)(i). The most recent version of the Table, which can be found at 42 C.F.R. § 100.3, identifies the vaccines covered under the Program, the corresponding injuries, and the time period in which the particular injuries must occur after vaccination. Section 14(a). If petitioner establishes that the vaccinee has suffered a "Table Injury," causation is presumed.

In order to qualify for a Table presumption of causation for GBS, a petitioner must establish that she experienced the onset of her symptoms within 3-42 days of the subject flu vaccination, and that she satisfies the criteria set forth in the Act's Qualifications and Aids to Interpretation ("QAIs"). 42 C.F.R. Section 100.3(c)(15). The QAIs require a showing of (A) bilateral flaccid limb weakness and decreased or absent deep tendon reflexes in weak limbs; (B) a monophasic illness pattern; (C) an interval between onset and nadir of weakness between 12 hours and 28 days; (D) subsequent clinical plateau (which leads to either stabilization at the nadir of symptoms or subsequent improvement without significant relapse); and (E) the absence of an identified more likely alternative diagnosis – including (in relevant part) CIDP and vasculitis. Sections 100.3(c)(15)(ii), (vi).

If, however, the vaccinee suffered an injury that either is not listed in the Table or did not occur within the prescribed time frame, petitioner must prove that the administered vaccine caused injury to receive Program compensation on behalf of the vaccinee. Section 11(c)(1)(C)(ii) and (iii). In such circumstances, petitioner asserts a "non-Table or [an] off-Table" claim and to prevail, petitioner must prove her claim by preponderant evidence. Section 13(a)(1)(A). This standard is "one of . . . simple preponderance, or 'more probable than not' causation." *Althen v. Sec'y of Health & Human Servs.*, 418 F.3d 1274, 1279-80 (Fed. Cir. 2005) (referencing *Hellebrand v. Sec'y of Health & Human Servs.*, 999 F.2d 1565, 1572-73 (Fed. Cir. 1993). The Federal Circuit has held that to establish an off-Table injury, petitioners must "prove . . . that the vaccine was not only a but-for cause of the injury but also a substantial factor in bringing about the injury." *Shyface v. Sec'y of Health & Human Servs.*, 165 F.3d 1344, 1351 (Fed. Cir 1999). *Id.* at 1352. The received vaccine, however, need not be the predominant cause of the injury. *Id.* at 1351.

The determination that a petitioner is entitled to compensation must not be "based on the claims of a petitioner alone, unsubstantiated by medical records or by medical opinion." Section 13(a)(1). Further, contemporaneous medical records are presumed to

7

be accurate and complete in their recording of all relevant information as to petitioner's medical issues. *Cucuras v. Sec'y of Health & Human Servs.*, 993, F.2d 1525, 1528 (Fed. Cir. 1993). Testimony offered after the events in questions is considered less reliable than contemporaneous reports because the need for accurate explanation of symptoms is more immediate. *Reusser v. Sec'y of Health & Human Servs.*, 28 Fed. Cl. 516, 523 (1993).

## Analysis

As articulated in my Order to Show Cause, Petitioner's medical records contain multiple proposed diagnoses: GBS, CIDP, ANCA vasculitis, vasculitis neuropathy, microscopic polyarteritis nodosa, microscopic polyangiitis, RA, fibromyalgia, and acute-on-chronic kidney issues – with many of her treaters suspecting ANCA vasculitis as the most accurate. Thus, it is not facially evident that Petitioner did suffer from GBS, as alleged. Indeed, this record suggests that what may have been *thought* to be GBS initially was deemed later to be something else.

The evolution of Petitioner's diagnosis was supported by her failure to improve following traditional treatments for GBS. *See,* e.g., Ex. 9 at 14; Ex. 24 at 125. More so, Petitioner's clinical course is inconsistent with the acute, monophasic nature of GBS as defined by the QAIs. Petitioner first sought formal treatment for possibly-neurologic issues within three weeks or so of vaccination, but *then* over a month passed before Petitioner's symptoms were acute enough to lead her to seek emergency treatment at the nadir of her symptoms. *Compare* Ex. 4 at 1 (presenting within three weeks of vaccination on October 28, 2019), *with* Ex. 6 at 5 (returning to the ER on December 3, 2019). The presence of an identified more likely alternative diagnosis, including CIDP and/or vasculitis, ultimately precludes Petitioner from establishing a Table GBS claim, as her injury is inconsistent with the Table-defined version of GBS in the QAIs. For this reason, her Table GBS claim must be dismissed.

Because Petitioner has not demonstrated a GBS diagnosis consistent with the QAIs, I do not find it necessary to make a determination regarding onset at this time. I will note, however, there exist notations in the contemporaneous medical records (corroborated by Petitioner's affidavit) that *could* support a one-day onset of her overall injury.[5] *See,* e.g., Ex. 26 at 93-94 (reporting that "she had a flu shot and the following day started noticing issues with diarrhea nausea vomiting and feeling achy[,]" followed by weakness and pain). Although a claimant might seek to argue (on a non-Table basis) that

---

[5] There also exist notations placing onset of her neurological symptoms of weakness and joint swelling beginning three days post vaccination, or around October 7, 2019. Ex. 5 at 4.

a one-day onset was medically acceptable, more often than not such arguments fail.[6] Only under special circumstances has such a short onset succeeded.[7] While these determinations do not control this outcome, they demonstrate that what is known medically/scientifically about the pathogenesis of GBS weighs against findings of flu vaccine causality when the onset is too close temporally to the vaccination event.

Despite this, it certainly is not the case in the Program that a claimant could *never* establish a claim based on a very short onset. And here, it is conceivable that a non-Table claim could likewise be viable or, alternatively, that onset was later than one day post vaccination. However, expert support will be necessary for the resolution of a causation-in-fact claim and a determination regarding diagnosis and onset.

### Conclusion

Petitioner cannot proceed on a Table GBS claim in this matter, and therefore any such claim is hereby **DISMISSED.** Petitioner's non-Table claim, however, may proceed. Because of the factual and medical issues to be decided (requiring amplification via experts), the claim is unlikely to be expeditiously resolved in SPU. For this reason, transfer is appropriate. **Pursuant to Vaccine Rule 3(d), the above-captioned case is hereby transferred out of SPU and reassigned randomly to a Special Master by the Clerk's Office. Further proceedings will be determined by the assigned Special Master.**

IT IS SO ORDERED.

<u>**s/Brian H. Corcoran**</u>
Brian H. Corcoran
Chief Special Master

---

[6] *See, e.g., Rowan v. Sec'y of Health & Human Servs.,* No. 17-760V, 2020 WL 2954954, at *16-19 (Fed. Cl. Spec. Mstr. Apr. 28, 2020) (finding a GBS onset sooner than three days post vaccination was not scientifically or medically supported by the record, given that GBS is known to be mediated by antibodies produced via the adaptive immune system, and this process takes longer than 3 days to result in symptoms); *Orton v. Sec'y of Health & Human Servs.*, No. 13-631V, 2015 WL 1275459, at *3-4 (Fed. Cl. Spec. Mstr. Feb. 23, 2015) (finding a 1-day onset of GBS following a flu vaccination was not substantiated by the evidence).

[7] *See, e.g.*, *Lehrman v. Sec'y of Health & Human Servs.*, No. 13-901V, 2018 WL 1788477, at *14-19 (Fed. Cl. Spec. Mstr. Mar. 19, 2018) (finding entitlement for a petitioner who established a pre-vaccination history of an upper respiratory infection, which, in combination with the flu vaccination, was found to have resulted in an upregulation of the petitioner's immune system that led to a rapid onset of GBS and thus a 1-day onset was appropriate); *Shyface v. Sec'y of Health & Human Servs.*, 165 F.3d 1344, 1352-53 (Fed. Cir. 1999) (finding that a petitioner must prove that the vaccine was a substantial factor – not the only factor – in causing the illness and that the harm would not have occurred in the absence of the vaccination).